UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

────────────────

No. 11-cv-3835 (RJS)
No. 09-cr-414 (RJS)

────────────────

JAMES NICHOLSON

Petitioner,

VERSUS

THE UNITED STATES OF AMERICA,

Respondent.

────────────────

OPINION AND ORDER
September 22, 2014

────────────────

RICHARD J. SULLIVAN, District Judge:

James Nicholson ("Petitioner") brings this petition for the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2255, challenging the sentence imposed by the Court after Petitioner pleaded guilty to securities fraud, investment adviser fraud, and mail fraud. For the reasons set forth below, the petition is denied.

I. BACKGROUND

A. Facts

On April 23, 2009, a grand jury returned a four-count Indictment charging Petitioner with: (1) securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff (Count One); (2) investment adviser fraud, in violation of 15 U.S.C. §§ 80b-6 and 80b-17 (Count Two); (3) mail fraud, in violation of 18 U.S.C. §§ 1341 and 1342 (Count Three); and (4) unlawful structuring of monetary transactions to evade reporting requirements, in violation of 31 U.S.C. § 5324 (Count Four).[1] (*See*

---

[1] Unless otherwise indicated, citations to docketed items refer to those materials that appear on ECF in *Nicholson v. United States*, No. 11-cv-3835 (RJS) (S.D.N.Y.). However, the facts are drawn principally from the record in Petitioner's underlying criminal case, *United States v. Nicholson*, No. 09–cr-414 (RJS) (S.D.N.Y.), including the Indictment (09-cr-414, Doc. No. 6 ("Indict.")), the transcript of Petitioner's change of plea hearing (09-cr-414, Doc. No. 28 ("Plea Tr.")), and the transcript of Petitioner's sentencing hearing (09-cr-414, Doc. No. 79 ("Sent. Tr.")). The Court has also considered Petitioner's memorandum of law in support of his petition (Doc. No. 2 ("Pet.")), the government's memorandum of

Indict. ¶¶ 10–18.) Specifically, the Indictment alleged that Petitioner was the president and senior portfolio manager of Westgate Capital Management LLC ("Westgate Capital"), an investment adviser responsible for managing the funds of several underlying investment vehicles on behalf of investors. (Indict. ¶¶ 1–2.) To execute the fraudulent scheme, Petitioner made false statements to induce prospective clients to invest with Westgate Capital, failed to invest investors' funds as promised, and misappropriated and converted investors' funds to his own benefit and the benefit of others. (Indict. ¶ 3.) Petitioner ultimately "caused investors to lose more than $150 million." (Indict. ¶ 7.)

On December 11, 2009, Petitioner pleaded guilty to Counts One, Two, and Three of the Indictment pursuant to the Plea Agreement. (Plea Tr. at 29:4–21.) The Plea Agreement provided for the dismissal of Count Four of the Indictment, the structuring charge (Plea Agrt, at 2), which carried a statutory maximum sentence of 120 months' imprisonment, *see* 31 U.S.C. § 5324(d)(2). As a result of this dismissal, Petitioner faced a total combined maximum sentence of forty-five years' imprisonment, rather than a total maximum sentence of fifty-five years' imprisonment. (Opp'n at 4.) The Plea Agreement also included the parties' stipulations regarding the application of the United States Sentencing Guidelines ("U.S.S.G.") to Petitioner. (*See* Plea Agreement at 3–5.) Among other things, the parties stipulated that (i) Petitioner had zero criminal history points and was therefore in criminal history category I; (ii) Petitioner's base offense level was seven, pursuant to U.S.S.G.

___

law in opposition (Doc. No. 12 ("Opp'n")), Petitioner's reply brief (Doc. No. 13 ("Reply")), and the plea agreement between Petitioner and the government (Pet. Ex. C ("Plea Agrt.")).

§ 2B1.1(a)(1); (iii) an increase of six offense levels was warranted, pursuant to U.S.S.G. § 2B1.1(b)(2)(C), because his offense involved 250 or more victims; (iv) an increase of two levels was warranted, pursuant to U.S.S.G. § 2B1.1(b)(14)(A), because he derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense; and (v) an increase of four levels was warranted, pursuant to U.S.S.G. § 2B1.1(b)(17)(A),[2] because Petitioner was an investment adviser at the time of the offense and the offense involved a violation of securities law. (*See* Plea Agrt. at 4–5; Plea Tr. at 26:16–27:1.)

The Plea Agreement further specified that the parties disagreed about the loss amount for sentencing purposes pursuant to U.S.S.G. § 2B1.1(b)(1), with the government contending that the loss to victims was $100–200 million and Petitioner asserting that the loss was $7–20 million. (Plea Agrt. at 4.) As a result of this difference, the government contended that Petitioner's total offense level was forty-two, resulting in an applicable Guidelines range of 360 to 540 months' imprisonment. (*Id.* at 5.) Petitioner, by contrast, argued that his total offense level was thirty-six, yielding an applicable Guidelines range of 188 to 235 months' imprisonment. (*Id.* at 4–5.) Finally, the Plea Agreement contained an appellate and collateral attack waiver, whereby Petitioner agreed that he would neither directly appeal nor challenge under 28 U.S.C. § 2255 or § 2241 any sentence

___

[2] Under the current version of the Guidelines, the investment adviser enhancement is found in U.S.S.G. § 2B1.1(b)(19)(A)(iii). Unless otherwise indicated, citations to the Guidelines in this Opinion and Order refer to the version of the Guidelines that was in effect at the time of Petitioner's sentencing on May 28, 2010.

2

within or below the proposed Guidelines ranges. (*Id*. at 6.)

At the plea hearing, Petitioner was placed under oath, and the Court inquired into and was satisfied as to Petitioner's competence to plead guilty. (Plea Tr. at 2:20–5:8.) The Court asked whether Petitioner had sufficient time to discuss the plea agreement with his attorneys (*id.* at 25:5–13), explained the charges in the Indictment and confirmed that Petitioner understood each charge (*id*. at 14:3–20), reviewed the maximum penalties for the offenses to which Petitioner was pleading guilty (*id*. at 17:13–18:17), and confirmed Petitioner's understanding that he was waiving his right to appeal or otherwise challenge any sentence imposed by the Court that was less than 45 years' imprisonment (*id.* at 27:2–7). At the conclusion of the proceeding, the Court determined that Petitioner understood his rights and knowingly waived them (Plea Tr. at 8:2–13:19), and that his plea was entered knowingly and voluntarily and was supported by an independent basis in fact for each of the elements of the offenses charged in Counts One through Three of the Indictment (*id.* at 13:20–37:20). Consequently, the Court accepted Petitioner's guilty plea and set a date for sentencing. (*Id.* at 38:18–25, 44:5–21.)

On May 28, 2010, the Court held a hearing on the disputed issue of loss amount, and, after considering the parties' arguments, concluded that losses to Petitioner's victims exceeded $100 million. (09-cr-414, Doc. No. 59.) On October 29, 2010, the Court held a sentencing hearing where it adopted the Presentence Investigation Report and found a total Guidelines offense level of forty-two,[3] a criminal history category of I, and a resulting Guidelines range of 360 to 540 months' imprisonment. (Sent. Tr. at 7:21–8:25.) After hearing arguments from counsel and statements from nine victims, Defendant, and Defendant's mother, the Court sentenced Petitioner to 480 months' imprisonment and three years' supervised release. (*Id.* at 77:19–79:13.) The forty-year term of imprisonment was within the stipulated sentencing range set forth in the Plea Agreement, thus triggering the waivers specified in the Plea Agreement.

### B. Procedural History

On November 4, 2010, Petitioner filed a timely notice of appeal. (09-cr-414, Doc. No. 77.) On February 22, 2011, Petitioner moved to withdraw the appeal without prejudice to reinstatement, pending adjudication of his forthcoming § 2255 petition. (*United States v. Nicholson*, No. 10-4544 (2d Cir.), Doc. No. 32.) On June 6, 2011, Petitioner filed the instant petition under § 2255 to vacate, set aside, or correct his sentence (Doc. No. 1), as well as a renewed motion to withdraw his appeal pending resolution of his § 2255 petition in the interest of efficiency and judicial

---

[3] The Court arrived at a Guidelines offense level of 42 as follows: the base offense level was 7 pursuant to § 2B1.1(a)(1); the offense level was increased by 26 levels, pursuant to § 2B1.1(b)(1)(N), because a reasonable estimate of the loss was between $100–200 million; the offense level was increased by 6 levels, pursuant to § 2B1.1(b)(2)(C), because the offense involved 250 or more victims; the offense level was increased by 2 levels, pursuant to § 2B1.1(b)(14)(A), because Petitioner derived more than $1,000,000 from financial institutions as a result of the offense; the offense level was increased by 4 levels, pursuant to § 2B1.1(b)(17)(A), because Petitioner was an investment adviser and the offense involved a violation of the securities law; the offense level was reduced by 2 levels, pursuant to § 3E1.1(a), because of Petitioner's satisfactory acceptance of responsibility; and the offense level was reduced by 1 level, pursuant to § 3E1.1(b), because Petitioner gave timely notice of his intention to plead guilty.

economy (*United States v. Nicholson*, No. 10-4544 (2d Cir.), Doc. No. 51). His motion to withdraw the appeal was granted on June 23, 2011. (*United States v. Nicholson*, No. 10-4544-cr (2d Cir.), Doc. No. 57.)

In his § 2255 petition, Petitioner asserts that his attorney provided ineffective assistance and asks the Court to vacate his sentence and resentence him. Specifically, Petitioner contends that (1) his counsel failed to advise him of potential legal challenges that could be mounted in the event the Court imposed consecutive terms of imprisonment for his securities fraud and mail fraud convictions, and (2) his counsel improperly advised him to plead guilty – pursuant to a plea agreement that waived specific rights and potential challenges to his sentence – instead of preserving those rights and potential challenges to his sentence by pleading guilty to the Indictment without a plea agreement. (Pet. at 1.) The Court will address each in turn.

## II. Legal Standard

Section 2255 enables a prisoner who was sentenced by a federal court to petition that court to vacate, set aside, or correct the sentence on the grounds that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). Relief under § 2255 is generally available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (citation and internal quotation marks omitted). "Because collateral challenges are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack." *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010) (citation and internal quotation marks omitted). A claim of ineffective assistance of counsel, however, is one permissible basis for bringing a § 2255 petition.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant's right to the assistance of counsel. U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense."). When challenging the effectiveness of counsel's assistance, a party must demonstrate that (1) counsel's representation "fell below an objective standard of reasonableness" measured against "prevailing professional norms," and (2) this "deficient performance prejudiced the defense" in the sense that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984). A court must reject a movant's ineffective assistance of counsel claim if it fails to meet either prong. *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013) (citing *Strickland*, 466 U.S. at 687 and *Bennett v. United States*, 663 F.3d 71, 85 (2d Cir. 2011)).

With respect to *Strickland*'s first prong, when assessing counsel's performance, a court "must judge [counsel's] conduct on the basis of the facts of the particular case, 'viewed as of the time of counsel's conduct,' and may not use hindsight to second-guess his strategy choices." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (quoting *Strickland*, 466 U.S. at 690). "Actions

and/or omissions taken by counsel for strategic purposes generally do not constitute ineffective assistance of counsel." *Gibbons v. Savage*, 555 F.3d 112, 122 (2d Cir. 2009) (citing *Strickland*, 466 U.S. at 690–91). Overall, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.

With respect to the second prong under *Strickland*, in most contexts, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" *Gonzalez*, 722 F.3d at 130 (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)). In two recent decisions, however, the Supreme Court has refined what prejudice must be shown under *Strickland* when challenging the effectiveness of counsel during the plea bargaining process. *See Lafler v. Cooper*, 132 S. Ct. 1376, 1388 (2012) (noting that "the right to adequate assistance of counsel cannot be defined or enforced without taking account of the central role plea bargaining plays in securing convictions and determining sentences."); *Missouri v. Frye*, 132 S. Ct. 1399, 1408 (2012) (holding that "as a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused"). In *Frye*, the Supreme Court reaffirmed *Hill*'s holding "that where a defendant complains that ineffective assistance led him to accept a plea offer as opposed to proceeding to trial," the defendant must show a reasonable probability that he would have insisted on going to trial. 132 S. Ct. at 1409. However, the Supreme Court in *Frye* further noted that in order "[t]o show prejudice from ineffective assistance of counsel where a plea has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea had they been afforded effective assistance of counsel." *Id.* The facts in *Frye* arose in a situation that was the inverse of those in the instant Petition. There, respondent Frye – a criminal defendant who had attacked the effectiveness of counsel's assistance in a postconviction motion for relief – "argue[d] that with effective assistance he would have accepted an earlier plea offer . . . as opposed to entering an open plea." *Frye*, 132 S. Ct. at 1410. In order to establish prejudice in that context, the Supreme Court stated that "it is necessary to show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." *Id.* at 1409.[4] Therefore, even under the most generous reading of *Strickland* and its progeny, Petitioner here must show that pleading guilty without a plea agreement would have resulted in a more favorable sentence.

### III. DISCUSSION

The Court will first address the issue of whether Petitioner's waiver, memorialized in the Plea Agreement and at the change of plea hearing, of his right to collaterally attack his sentence bars this § 2255 petition. Finding that it does not, the Court will then turn to the merits of Petitioner's claims of ineffective assistance of counsel. For the reasons that follow, the Court denies the

---

[4] Similarly, the Supreme Court in *Lafler* made clear that where "a plea bargain has been offered, [and a defendant has been deprived of the] right to effective assistance of counsel in considering whether to accept it[,] . . . *prejudice can be shown if loss of the plea opportunity led to* a trial resulting in a conviction on more serious charges *or the imposition of a more severe sentence*." 132 S. Ct. at 1387 (emphasis added).

5

§ 2255 petition and finds that Petitioner is not entitled to habeas relief.

### A. Waiver

Although the Plea Agreement expressly provides that Petitioner may not appeal or otherwise challenge any sentence of forty-five years or less, Petitioner argues that he did not knowingly and intelligently waive his right to file a § 2255 petition and, as a result, his waiver is unenforceable. (Pet. at 20–21.) Specifically, Petitioner argues that he received ineffective assistance of counsel with respect to the government's plea offer and that therefore the waiver of rights provision is unenforceable. (*Id*. at 26–27.)

A waiver of the right to appeal a sentence within an agreed upon guideline range is presumptively valid and enforceable. *See, e.g.*, *United States v. Arevalo*, 628 F.3d 93, 98 (2d Cir. 2010); *United States v. Pearson*, 570 F.3d 480, 485 (2d Cir. 2009). Thus, "[w]here the record clearly demonstrates that the defendant's waiver . . . was knowing and voluntary, that waiver is enforceable." *United States v. Monzon*, 359 F.3d 110, 116 (2d Cir. 2004) (citations omitted); *see also United States v. Roque*, 421 F.3d 118, 121–24 (2d Cir. 2005). However, "a waiver of appellate or collateral attack rights does not foreclose an attack on the validity of the process by which the waiver has been procured, here, the plea agreement." *Frederick v. Warden, Lewisburg Corr. Facility*, 308 F.3d 192, 195–96 (2d Cir. 2002) (citation omitted). A court may therefore set aside a waiver where the "defendant is challenging the constitutionality of the process by which he waived those rights," *United States v. Hernandez*, 242 F.3d 110, 113 (2d Cir. 2001) (per curiam), including when "the defendant claims that the plea agreement was entered into without effective assistance of counsel," *id.* at 113–14 (collecting cases).

Here, Petitioner claims that he did not knowingly and voluntarily waive his right to collaterally attack his sentence as a result of having received ineffective assistance of counsel. Thus, notwithstanding the Court's satisfaction with Petitioner's competence to plead guilty at the December 11, 2009 hearing – not to mention the Court's detailed colloquy with Petitioner concerning the consequences of the appellate waiver with respect to his ability to challenge any sentence that was equal to or less than the combined statutory maximum sentence of forty-five years – the Court will turn to the merits of Petitioner's ineffective assistance of counsel claims.

### B. Merits of Ineffective Assistance of Counsel Claim

Petitioner claims ineffective assistance of counsel arising from his attorney's failure, during the negotiation and execution of the Plea Agreement, to advise him of certain potential challenges applicable to the Plea Agreement and sentencing. Petitioner alleges that counsel failed to advise him that (i) "the Double Jeopardy Clause barred consecutive sentences for the crimes to which [Petitioner] pled guilty"; (ii) "the enhancement under U.S.S.G. § 2B.1(b)(17)(A) . . . represented improper double-counting"; (iii) Petitioner "had the right to seek certain downward departures from the adjusted offense level determined by the Court"; and (iv) Petitioner would not receive any further sentencing benefits if he pleaded guilty pursuant to the Plea Agreement rather than the Indictment. (Pet. at 1, 17–20.) Petitioner asserts that but for counsel's deficient advice, he would not have accepted the government's plea offer and, instead, would have pleaded guilty to the Indictment without any plea agreement. (*Id.*)

6

1. Petitioner's Double Jeopardy Claim

Petitioner argues that he is entitled to relief under § 2255 because counsel failed to advise him that the Double Jeopardy Clause of the Fifth Amendment barred the government from charging him with securities fraud and mail fraud for the same underlying conduct.  (Pet. at 1, 14–15.) Petitioner contends that, at least with respect to the charges in the Indictment, securities fraud and mail fraud are the same crime and that the Indictment was therefore multiplicitous.  (Pet. at 14–17.)

The Fifth Amendment to the United States Constitution provides that "[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb."  U.S. CONST. amend. V.  "An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999).  A multiplicitous indictment "violates the Double Jeopardy Clause of the Fifth Amendment, subjecting a person to punishment for the same crime more than once." *Id.*  Such an indictment may also "improperly prejudice a jury by suggesting that a defendant has committed not one but several crimes." *United States v. Reed*, 639 F.2d 896, 904 (2d Cir. 1981).

In assessing whether a defendant is impermissibly charged with essentially the same offense more than once in violation of the Double Jeopardy Clause, courts are to apply the "same-elements" test articulated by the Supreme Court in *Blockburger v. United States*.  284 U.S. 299 (1932); *see also United States v. Dixon*, 509 U.S. 688, 696 (1993) (affirming continued application of the *Blockburger* test).  Under the *Blockburger* test, "[t]he applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger*, 284 U.S. at 304.  *See also Dixon*, 509 U.S. at 696 ("[The *Blockburger* test asks] whether each [charged] offense contains an element not contained in the other [charged offense]; if not, they are the 'same offen[s]e' and double jeopardy bars additional punishment and successive prosecution"); *Knapp v. Leonardo*, 46 F.3d 170, 178 (2d Cir. 1995).

In applying the *Blockburger* test, courts focus not on the proof the government may present at trial, but rather on the statutory elements of the offenses.  *See, e.g.*, *Albernaz v. United States*, 450 U.S. 333, 338 (1981).  The Second Circuit has held that even if both charged offenses are based on identical evidence, as Petitioner alleges is the case here, the focus nonetheless remains on the statutory elements.  *See, e.g.*, *United States v. Biasucci*, 786 F.2d 504, 516 (2d Cir. 1986) ("If each *statute* requires proof of a fact that the other does not, the *Blockburger* test is satisfied, even if the same proof is used at trial to establish both crimes."); *United States v. Langella*, 776 F.2d 1078, 1082 (2d Cir. 1985) (holding that even if both convictions were based on the same conduct, "*Albernaz* requires us to focus on the provisions of the statutes involved, rather than on the evidence adduced at trial").

Here, notwithstanding Petitioner's arguments, the two offenses charged in the Indictment require the prosecution to establish different elements.  Indeed, the Second Circuit in *Reed* expressly rejected a double jeopardy challenge to charges of mail

7

fraud and securities fraud,[5] finding that the charged counts "contained different elements and each could have stood alone." 639 F.2d at 905; *see also id.* ("Moreover, even if the test for multiplicity were held to be whether Congress had intended the conduct referred to in the various counts to constitute separate offenses, . . . the indictment here meets that standard as well. The mail fraud and the securities fraud statutes properly exist 'side by side.'" (citations omitted)).

Applying the *Blockburger* test – and *Reed* – to this case, the Court finds that securities fraud and mail fraud are not the same offenses for double jeopardy purposes, since the statutory elements of these offenses require proof of different facts.[6]

Therefore, the Court necessarily finds that counsel's performance – in failing to advise Petitioner (erroneously) that "the Double Jeopardy Clause barred consecutive sentences for the crimes to which he pled guilty" (Pet. at 1) – did not "f[a]ll below an objective standard of reasonableness" measured against "prevailing professional norms," *Strickland*, 466 U.S. at 687–88, and did not result in prejudice, since counsel could not have brought a meritorious double jeopardy challenge on Petitioner's behalf.

2. Investment Adviser Enhancement

Petitioner next contends that counsel was ineffective by virtue of having failed to advise him that "the [investment adviser] enhancement under U.S.S.G. § 2B1.1(b)(17)(A) . . . represented improper double-counting," since investment adviser fraud was one of the counts to which he pleaded guilty. (Pet. at 1.) As with Petitioner's double jeopardy argument, the Court finds that the advice provided by counsel on this issue was accurate and therefore not ineffective. Specifically, the Court concludes that the three counts of the Indictment to which Petitioner pleaded guilty – securities fraud, investment adviser fraud, and mail fraud – were properly grouped together pursuant to U.S.S.G. § 3D1.2(d). The Court further finds that the offense level for the group was properly determined by applying the Guidelines to the aggregate behavior in accordance with U.S.S.G. § 3D1.3(b). According to the

---

[5] The securities violation in *Reed* "involved section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b)." 639 F.2d at 905.

[6] Specifically, to prove a violation of 15 U.S.C. § 78j(b), "the government must establish beyond a reasonable doubt the following elements of the crime of securities fraud: First, that in connection with the purchase or sale of [a security] the defendant did any one or more of the following: (1) employed a device, scheme or artifice to defraud, or (2) made an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading, or (3) engaged in an act, practice or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller. Second, that the defendant acted willfully, knowingly and with the intent to defraud. Third, that the defendant knowingly used, or caused to be used, any means or instruments of transportation or communication in interstate commerce or the use of the mails in furtherance of the fraudulent conduct." *See* Leonard B. Sand, *et al.*, 3 Modern Federal Jury Instructions: Criminal, Instruction 57:20 (2012).

In order to prove mail fraud in violation of 18 U.S.C. § 1341, "the government must prove each of the following elements beyond a reasonable doubt: First, that there was a scheme or artifice to defraud or to obtain money or property . . . by materially false and fraudulent pretenses, representations or promises, as alleged in the indictment; [s]econd, that the defendant knowingly and willfully participated in the scheme or artifice to defraud, with knowledge of its fraudulent nature and with specific intent to defraud . . . ; and [t]hird, that in execution of that scheme, the defendant used or caused the use of the mails (or a private or commercial interstate carrier or interstate wires) as specified in the indictment." *See* Leonard B. Sand, *et al.*, 2 Modern Federal Jury Instructions: Criminal, Instruction 44:3 (2012).

Guidelines, where counts are grouped, as they were here, "the highest offense level of the counts in the group is used." *Id.* cmt. 2. In this case, both the securities fraud and mail fraud counts on which Petitioner was convicted carried a base offense level of seven, *see* U.S.S.G. § 2B1.1(a)(1), which was higher than the base offense level of six resulting from the investment adviser fraud count standing alone, *see* U.S.S.G. § 2B1.1(a)(2). In all other respects, the enhancements for the various counts – whether considered together or separately – were identical, yielding a total offense level of forty-two for the securities and mail fraud counts and forty-one for the investment adviser fraud count.[7] Therefore, the securities fraud and mail fraud counts drove the sentence for the group consisting of the three closely related counts of conviction.

In essence, Petitioner asserts that the investment adviser enhancement may not be applied when a defendant has pleaded guilty to investment adviser fraud – whether alone or in tandem with other counts. This is simply wrong. The Guidelines require a four-level enhancement "[i]f the offense involved . . . a violation of securities law and, at the time of the offense, the defendant was . . . an investment adviser," U.S.S.G. § 2B1.1(b)(17); thus, the Guidelines expressly contemplate an enhancement for investment advisers who violate the Investment Advisers Act.[8] Moreover, the Second Circuit has made clear that district courts are not barred from applying an enhancement based on conduct that is also an element of an offense for which a defendant is being sentenced. *See United States v. Maloney*, 406 F.3d 149, 154 (2d Cir. 2005) (rejecting view that "double counting of primary offense conduct [through both application of an enhancement and base offense level determination] is *per se* impermissible in calculating a Guidelines sentence" because such a position "would be irreconcilable with our case law"). Not surprisingly, courts have consistently applied the investment adviser enhancement in cases where defendants have pleaded guilty to violations of 15 U.S.C. §§ 80b-6 and 80b-17. *See, e.g.*, *United States v. Vilar*, No. 05-cr-621 (RJS), Doc. No. 434 (S.D.N.Y. Feb. 5, 2010), *aff'd in part, vacated on other grounds*, 729 F.3d 62 (2d Cir. 2013); *United States v. Madoff*, No. 09-cr-213 (DC), Doc. No. 103 (S.D.N.Y. June 29, 2009). Petitioner's interpretation of the Guidelines – whereby a defendant who pleaded guilty to an investment adviser fraud count could *not* be assessed an enhancement pursuant to U.S.S.G. § 2B1.1(b)(17)(A)(iii) – would lead to a perverse, and frankly absurd, outcome since it would require that a defendant convicted of the three offenses here receive a shorter Guidelines sentence than a hypothetical criminal defendant convicted of only securities fraud and mail fraud. Petitioner cites no authority for such a proposition, which defies both common sense and the plain language of the provision.

Since the Court correctly calculated and applied Petitioner's offense level pursuant to §§ 2B1.1, 3D1.2(d), 3D1.3(b), and 5G1.2, it

---

[7] *See supra* note 3.

[8] The investment adviser enhancement requires the offense to have involved "a violation of the securities laws" in order for the enhancement to apply. U.S.S.G. § 2B1.1(b)(17)(A)(iii). Application Note 14(A) to that section defines the "securities laws" to include "the provisions of law referred to in . . . 15 U.S.C. § 78c(a)(47)." *Id.* Application Note 14(A). That provision of the United States Code in turn references the Investment Advisers Act of 1940. *See*

15 U.S.C. § 78c(a)(47) ("The term 'securities laws' means . . . the Investment Advisers Act of 1940 (15 U.S.C. § 80b *et seq.* . . . .").

9

can hardly be argued that counsel's failure to advise Petitioner otherwise constituted conduct falling "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88, 694. Nor can it be said that such advice – which accurately stated the law – in any way prejudiced Petitioner, since he could not have prevailed on this point had it been argued to the Court.

### 3. Benefits of Pleading Guilty Pursuant to the Plea Agreement

Petitioner further argues, more broadly, that counsel should have advised Petitioner that he would not receive any sentencing benefits by pleading guilty pursuant to the Plea Agreement as opposed to simply pleading to the Indictment. (Pet. at 1, 17–20.) Specifically, Petitioner challenges counsel's advice that (1) "the government's plea agreement benefitted [Petitioner] by avoiding a hearing at which the government could call victims to testify and elicit highly prejudicial material which might not otherwise come to light" (*id*. at 1–2), and (2) "the government's plea agreement benefitted [Petitioner] because it reduced his statutory maximum sentence from 55 to 45 years" (*id.* at 2). As to the latter argument, Petitioner argues that "[p]reserving the prospect of some possible liberty if [Petitioner] lives to his late 70[]s or early 80[]s . . . was not worth bargaining away all the challenges to a sentence within a thirty-year spread." (*Id.*; *see also id.* ("[I]t was incumbent on counsel to preserve all sentencing challenges, not bargain them away for illusory gain.").)

Notwithstanding Petitioner's arguments to the contrary, the Court finds that counsel's advice with respect to these issues was not objectively unreasonable and that Petitioner did indeed benefit from the Plea Agreement. As consideration for the stipulated Guidelines range and appellate waiver, the government consented to dismiss the structuring count, thereby reducing Petitioner's maximum exposure from fifty-five to forty-five years. That dismissal, coupled with the government's implicit agreement to forego additional substantive charges and offense level enhancements that arguably could have been applied to Petitioner's Guidelines calculation – such as an aggravating role enhancement pursuant to U.S.S.G. § 3B1.1(c) or a vulnerable victim enhancement pursuant to U.S.S.G. § 3A1.1(b) – gave Petitioner the certainty that he would not receive a sentence greater than forty-five years. Given his age and life expectancy, that concession was not insignificant, as it gave Petitioner the hope that he might at least not die in prison. Without a plea agreement, Petitioner ran the risk that the government might make arguments for additional enhancements, which could have increased the total offense level to forty-three or higher, resulting in a Guidelines sentence of life imprisonment and which, under the original indictment, would have resulted in a maximum sentence of fifty-five years. (*See* Opp'n at 4.)[9]

Of course, with or without a plea agreement, the ultimate sentence was always to be determined by the Court. The Plea Agreement made that explicit, as did the Court during its colloquy with Petitioner at the change of plea hearing. (Plea Tr. at 26:7–15.) Nevertheless, the fact that the Court ultimately imposed a forty-year sentence – less than the forty-five-year maximum sentence requested by the

---

[9] The Court further notes that absent a plea agreement, the government would have been free to seek a superseding indictment that could have charged Petitioner with additional counts for each instance of illegal conduct, thereby increasing Petitioner's sentencing exposure enormously. *See, e.g.*, *United States v. Madoff*, No. 09-cr-213 (DC), Doc. No. 100 (S.D.N.Y. June 29, 2009).

10

government under the Plea Agreement – does not mean that Petitioner received no benefit from the Plea Agreement. Moreover, *Strickland* bars courts from "look[ing] back and project[ing] ex post knowledge of consequences of the attorney's ex ante selection of one path among the many available to him." *Parisi v. United States*, 529 F.3d 134, 141 (2d Cir. 2008). Instead, courts are required to "consider the circumstances counsel faced at the time of the relevant conduct and to evaluate the conduct from counsel's point of view." *Davis v. Greiner*, 428 F.3d 81, 88 (2d Cir. 2005). When Petitioner entered into the Plea Agreement, neither party could have been certain of the sentence that the Court would ultimately impose, and counsel could have reasonably feared that the Court would impose the statutory maximum sentence of fifty-five-years had Petitioner pleaded guilty to the Indictment without the Plea Agreement. Thus, evaluating counsel's recommendation to enter into the Plea Agreement from counsel's point of view at the time the advice was rendered, the Court finds that Petitioner cannot show that counsel's performance in this respect fell "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88, 694. With respect to prejudice, the record is equally clear that – with or without a plea agreement – the Court would have imposed a sentence of at least forty years. *See infra* Part III.B.4. Accordingly, Petitioner cannot show prejudice since there is no "reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." *Frye*, 132 S. Ct. at 1409.

4. Other Downward Departure Arguments

Finally, Petitioner asserts that counsel failed to advise him that he "had the right to seek certain downward departures from the adjusted offense level determined by the Court" (Pet. at 1), including: (a) a downward departure to obviate the stacking of statutory maximums under U.S.S.G. § 5G1.2(d) (Pet. at 18); (b) "a downward departure based on the 'cumulative effects' of 'substantially overlapping enhancements'" (*id.* at 19); and (c) "a downward departure because the fraud loss overstated his culpability" (*id.* at 20).[10] Here, once again, the Court is unpersuaded that counsel's alleged failure to review with Petitioner every conceivable downward departure argument prior to recommending that Petitioner accept the Plea Agreement "fell below an objective standard of reasonableness" measured against "prevailing professional norms." *Strickland*, 466 U.S. at 688. It is rarely the case that defense counsel will have fully formulated his or her sentencing strategy at the time of the plea. In any event, the Court finds that Petitioner cannot establish that those alleged deficiencies by counsel ultimately resulted in any prejudice to Petitioner.

As the Court made clear at sentencing, and reiterates today, it would have imposed the same sentence of forty years' imprisonment even if counsel had made, and preserved, every argument raised in the Petition. Indeed, the forty-year sentence was not the result of a mechanical application of the Guidelines. It was, instead, a careful assessment and balancing

---

[10] Petitioner implicitly made these very arguments when he asked the Court, albeit unsuccessfully, "to look past the mathematical constraints of the Guidelines . . . [and impose] a sentence that is substantially below the Guidelines range." (09-cr-414, Doc. No. 70 at 17.) And with respect to the claim that "the fraud loss overstated [Petitioner's] culpability" (Pet. at 20), defense counsel expressly made this very argument at sentencing, to no avail (*see* Sent. Tr. at 15:6–19:16; *see also id.* at 72:13–14).

of the various factors identified by Congress and the Supreme Court as relevant to the calculation of a criminal sentence. As set forth on the record at the sentencing hearing and below, the Court's sentencing decision was driven largely by the history and characteristics of Petitioner, as well as the facts and circumstances of his criminal conduct, the need for general and specific deterrence, and the necessity of a just punishment that reflected the seriousness of the conduct at issue.

With respect to the history and characteristics of Petitioner, it bears noting, again, that Petitioner was not someone driven to a life of crime by poverty, addiction, or other difficult circumstances. Rather, as the Court observed at sentencing, Petitioner was someone who "had all the advantages of life." (*See* Sent. Tr. at 70:20; *see also id.* at 70:20–22 ("You had family, you had great health, you had a good education, you had intelligence, opportunity, good looks, charm, charisma, you had so much.").) Yet, despite all of that promise, Petitioner "used many of these [same] qualities to victimize people whose only error in judgment was trusting" him. (*Id.* at 70:23–24.)

Even more troubling was the fact that Petitioner had previously been disciplined, and in fact barred from the securities industry, for prior misconduct relating to the misuse of investor funds. On January 3, 2001, the National Association of Securities Dealers ("NASD") prohibited Petitioner from working in the securities industry in all capacities following an investigation of his conduct, which revealed that Petitioner had stolen hundreds of thousands of dollars from a client account. (Pre-Sentence Investigation Report, dated Oct. 8, 2010, ("PSR"), ¶¶ 94–97.)[11] Worse still, Petitioner attempted to obstruct the NASD's investigation by forging and notarizing a letter – which purported to be written by the victim – exonerating Petitioner of any wrongdoing. (PSR ¶¶ 94–96.) As a result of the NASD ban, Petitioner was not permitted to hold himself out as an investment adviser or accept client funds for any purpose – and therefore should not have been in a position to further defraud clients. (*See* PSR ¶ 97; *see also* Letter from Margaret Kurta, Senior Accountant, Office of the Att'y Gen., State of New York, to James Nicholson (Apr. 11, 2001), Doc. No. 45, Ex. U ("Our information shows that Mr. Nicholson was barred by the NASD in all capacities on 1/3/2001."); *id.* ("Any activity by Mr. Nicholson in advising members of the public . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling or holding securities[] will be a fraudulent practice under the General Business Law ("GBL") § 352(1), and an unlawful practice under GBL § 359-eee(4) . . . .").)

Finally, with respect to the facts and circumstances of the offense, the devastation left in Petitioner's wake was, and remains, staggering in its scope and depth. At sentencing, the Court stressed the wide-

---

[11] Typically, a PSR is not publicly docketed because of the sensitive material it contains and its nature "as a court document designed and treated principally as an aid to the court in sentencing . . . ." *United States v. Charmer Indus., Inc.*, 711 F.2d 1164, 1176 (2d Cir. 1983). However, in the Second Circuit, there is a well-established presumption in favor of open court records. *See United States v. Amodeo*, 44 F.3d 141, 146 (2d Cir. 1995). In light of that presumption and the fact that the portions of the PSR referenced in this Opinion and Order discuss information that is publicly available, the Court finds that limited disclosure of the contents of the PSR is appropriate and "meet[s] the ends of justice." *Charmer*, 711 F.2d at 1176.

reaching impact of Petitioner's criminal conduct, noting that "there are very few crimes of this magnitude [or] that have inflicted this much pain." (Sent. Tr. at 76:17–18.) Moreover, as the Court noted at sentencing, Petitioner's victims were, by and large, not sophisticated investors. They were, instead, middle class and working class people who trusted Petitioner to invest their life savings –accumulated as a result of decades of work and frugality or from the sale of homes purchased years before, which had appreciated in value and were expected to fund retirements and perhaps leave a little something extra for children and grandchildren. They "were individuals who basically gave [Petitioner] everything they had . . . [, only to have Petitioner] play[] on those relationships and cultivate[] them, encourag[ing] them . . . to invest their last pennies with him . . . ." (*Id.* at 71:6–13.) Each of the 250 victims suffered profoundly as a result of Petitioner's deviousness, but several in particular are worth mentioning for the sheer callousness, bordering on cruelty, exhibited by Petitioner.

Eleanor Ferraro, for example – a widow in her 80s – lost her entire life savings and was forced to obtain a reverse mortgage on her only remaining asset, her home. (Doc. No. 46, Ex. 4.) Ms. Ferraro's savings were the fruits of more than fifty years of labor on the part of her late husband, whose life's work culminated in the sale of his furniture refinishing business. (*Id*.) She now "struggle[s] to meet recurring bills, and . . . [is] unable to spend money on anything beyond [her] necessities." (*Id.*) Jeffrey Golden entrusted Petitioner with his mother's life savings of $50,000; when Mr. Golden asked Petitioner for an assurance that his mother's savings were safe, Petitioner told him, "you know there is nothing more precious to me than my [three] boys, and on their lives, I take an oath that your money is safe and accounted for." (Doc. No. 36, Ex. 14.) John Lalli lost his entire "life savings, pension, retirement, [and] college funds" after investing with Petitioner, and he and his wife were forced to sell their home. (Doc. No. 36, Ex. 22.) Petitioner's own brother-in-law and the godfather to his children, James Hostomsky, described Petitioner's crimes as having "left such a deep scar, not only financially, but emotionally[; w]e will never be the same." (Doc. No. 38, Ex. 44.) Josephine Esposito, a woman in her 80s, lost all of her savings and retirement funds and is now forced to survive month-to-month by relying on Social Security. (Doc. No. 39, Ex. 57.) Nadine Gross, a widow, lost approximately $400,000 that she had received after her husband passed away. (Doc. No. 36, Ex. 15.) Keri-Anne Fox – another widow who suffered as a result of Petitioner's conduct – lost $200,000 that was meant to fund her children's educations after investing with Petitioner following the death of her husband. (Doc. No. 36, Ex. 11.) She had approached Petitioner following her husband's death with hopes of securing the financial future of her children. (*Id.*) Petitioner assured her that "he knew exactly what to do with the money[,] stating that the investment was 99% guaranteed to make money, and rarely ever lost money." (*Id.*) That assurance was, in fact, a brazen lie, since Petitioner never invested her money at all, and instead spent the entire amount on cars, apartments, and a home for himself. These are but a sampling of the victims whose lives collided with Petitioner's seemingly insatiable greed.

Indeed, Petitioner's hunger for material things was truly voracious. As the Court noted at sentencing, "at a time when the world was collapsing, when there was no possibility of paying back [the money he had stolen, Petitioner] was buying a home

13

worth over $25 million in the Hamptons." (Sent. Tr. at 71:18–21.) That Hamptons mansion was hardly an outlier for Petitioner, who had also purchased a $5.75 million home in Saddle River, New Jersey in 2006, a $4.75 million penthouse in Palm Beach, Florida in 2007, an $8.5 million condominium in the Time Warner Building in Manhattan in 2008, and a $377,500 condominium in Montvale, New Jersey in 2008. (PSR ¶ 14.) Petitioner also owned multiple luxury BMW vehicles, a town car, a limousine, and an interest in a Gulfstream 200 aircraft. (*Id.*)

Petitioner's criminal conduct was egregious, and, as the Court made clear in imposing a forty-year sentence, the harm he caused affected lives in ways that cannot be measured in dollars and cents. Consider for a moment victim Shanna McKee, who lost nearly the entirety of her net worth as a result of Petitioner's crimes. (Doc. No. 39, Ex. 59.) Ms. McKee wrote that her "psyche will never truly heal from the emotional destruction caused by [Petitioner's] fraudulent actions[, and that she is] reminded everyday of all that [she] has lost, how [her] financial security was ripped away by his treachery, greed and deceit." (*Id.*) Or consider William Fitzgerald, who lost the majority of his family's savings, which took over twenty-five years to accrue, and can no longer afford to send his children to college, pay for his daughter's wedding, or even retire with his spouse. (Doc. No. 36, Ex. 10.) Victim Eileen Stallone's loss was similarly heartbreaking. After raising her son by herself and attending college classes at night and on weekends in order to advance professionally, Ms. Stallone managed to accumulate $350,000 in savings in her 401k. (Doc. No. 38, Ex. 51.) She invested those savings with Petitioner, who knowingly stole them. (*Id.*). Worse still, the day prior to his arrest, Petitioner assured Ms. Stallone that her money was safe. (*Id.*) Ms. Stallone was not alone in being told directly by Petitioner that her investments were secure, as Petitioner often swore on the lives of his children in order to assuage the concerns of investors who suspected wrongdoing without actually knowing just how bad things truly were. Thomas Truffa, for instance, lost over $500,000 that he had invested with Petitioner, despite Petitioner having sworn, once again, on the lives of his own children that the investments were safe. (Doc. No. 36, Ex. 37.) Similarly, Petitioner told Lorraine Reilly only two days prior to his arrest that her money was safe and, again, swore on the lives of his own children. (Doc. No. 36, Ex. 32.) Perhaps worst of all, Petitioner made those false pledges with full knowledge that he had been spending millions of dollars on luxury cars, boats, apartments, and vacation homes with the accumulated savings of people who had sacrificed and deferred gratification in the hope that they might know the peace of mind and security that come from a lifetime of work and thrift.

As Judge Chin said when sentencing another, more famous Ponzi-scheme operator, *see generally United States v. Madoff*, No. 09-cr-213 (DC), Doc. No. 103 (S.D.N.Y. June 29, 2009), this conduct was truly evil, and the lives of many of the investors from whom he stole will never be the same. Justice requires that such acts be punished, and that the punishment reflect the harm inflicted. George Washington once wrote that the "true administration of justice is the firmest pillar of good government." *United States v. Washington*, No. 11-cr-605 (RJS), Doc. No. 109 at 12 (S.D.N.Y. July 31, 2014). Clearly, the true administration of justice requires a decent regard for victims, who turn to the Court for protection, or at the very least for vindication, and for a reaffirmation of the

law and the values that underlie it. Petitioner showed no respect for that law, and no regard for those values, when he plundered the savings of his victims. For that, he must be punished. The Court is not without sympathy for Petitioner and his family, particularly his children, who are also innocent victims of these crimes. But the harms inflicted on his own family, like those inflicted on his victims, are wholly attributable to Petitioner, and the sentence imposed must reflect the magnitude of those harms.

After careful consideration of all these factors, the Court continues to believe that a sentence of forty years is sufficient but not more than necessary to meet the objectives of sentencing set forth in 18 U.S.C. § 3553(a). In fact, at sentencing, the Court stated the reasons why a sentence of forty years was the appropriate punishment for Petitioner's crimes, and made clear that Petitioner's sentence was the result of the Court's careful consideration of the factors set forth in 18 U.S.C. § 3553(a) rather than any rigid application of the Guidelines. (*See* Sent. Tr. at 69:8–77:6; *see also id.* at 72:9–10 ("The guidelines, there's no magic in them, not at all.").) Therefore, even if Petitioner were able to demonstrate that counsel's performance fellow below an objective standard of reasonableness, *Strickland*, 466 U.S. at 687–88, he cannot show prejudice since there is no "reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time," *Frye*, 132 S. Ct. at 1409.

### III. CONCLUSION

For the foregoing reasons, Petitioner has failed to establish his entitlement to habeas relief pursuant to 28 U.S.C. § 2255. Accordingly, the petition is DENIED. In addition, because Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c)(2); *Love v. McCray*, 413 F.3d 192, 195 (2d Cir. 2005). The Clerk of the Court is respectfully directed to enter judgment in favor of Respondent and to close this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: September 22, 2014
New York, New York

\* \* \*

Petitioner is represented by Andrew J. Frisch, Esq., 40 Fulton Street, 23rd Floor, New York, New York 10038.

Respondent is represented by Matthew L. Schwartz, Esq., United States Attorney's Office, Southern District of New York, One Saint Andrew's Plaza, New York, New York 10007.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/22/2014